ALBANY,
Feb. 1826.

Jackson
v.
Lervey

---

JACKSON, *ex dem.* THE PEOPLE, *against* LERVEY.(*a*)

EJECTMENT, to recover possession of 50 acres of land, being a part of lot number 26, in the township of Locke, as escheated land.

The following facts were agreed upon by the attorney general, and the attorney for the defendant:

Lot number 26, in the township of Locke, was drawn by Peter Stringerland, a soldier in the revolutionary war. Stringerland was a slave; and died during the war, leaving a child born of a woman, between whom and Stringerland the ceremony of marriage had taken place, previous to the birth of the child; and the defendant derived title, *bona fide*, from the child of Stringerland. The mother of the child was also a slave; and the child was born before the revolutionary war.

*John Porter*, for the defendant. There is nothing in the common law, which disqualifies the child to take and hold

*It seems* that at common law a slave could not contract matrimony; and his right to marry in this state depends upon the statute of Feb. 17, 1809, (sess. 32, ch 44, s. 2; 5 W. 450; 2 R. L. 201.) Hence the child of a slave could not inherit at common law.

At common law, a slave was not capable of taking lands either by descent or purchase.

But by the resolutions and laws of this state a slave might take lands granted to him for military services during the revolutionary war.

The children of such a slave, though born of a slave, with whom he had contracted marriage, before the statute of Feb. 17, 1809, (sess. 32. ch. 44, s. 2; 5 W. 450; 2 R. L. 201;) may inherit.

That act was retrospective; and legalized all marriages and births of slaves, before, as well as after its passage.

(*a*) This is the same case cited ante 314, 322, as *Jackson* v. *Hervey*.

real estate, as the heir of his father ; who was also capable of taking, though a slave. By the civil law, it is true, all conveyances to slaves enure to the benefit of their masters ; but the common law was never so strict. I find no case on the point in this country ; but at common law villeins approached, in their character and capacity, the nearest to an American slave. The villein could always take and hold property in his own right. (Co. Lit. s. 172. 2 Bl Com. 93.)

At any rate, an implied capacity to take is conferred by statute ; and results from the nature of the grant, both as to the grantee and his heirs. (See the resolutions and statutes cited by Kent, chancellor, 20 John. 703, *et seq*.)

The marriage of Stringerland, though both parties were slaves, was valid. Though a slave be restricted as to some contracts, yet he may make such as do not interfere with his master's rights. No case denies the validity of a marriage contract between slaves. It was permitted between villeins. The books speak of the heirs of villeins ; and even in Rome, where absolute slavery prevailed, cohabitation between slaves was permitted by the law. Slaves were there held as nothing, beyond any article of personal property. Not so here. The marriage in question would have been lawful in this state. (2 R. L. 201, s. 2.) This act was merely declaratory of the common law. It is retrospective in its terms.

*Talcott*, (attorney general) contra. The slave could not enlist, without his master's consent, which does not appear. If so, the commissioners have gone beyond their authority in allowing the patent to issue.

He could not take under the grant. The right and capacity of slaves are far different from those of English villeins. The former have no rights, except such as are given by statute. The civil law, and the law of all countries where slavery prevails, is so. A villein, as to every matter, except where his lord was concerned, was a freeman. He might sue, and be sued even by his lord, when he stood *en autre droit*. He might take land, though his lord could enter upon him. To find authorities applicable to this head, we must avoid England, and go to countries where slavery is tolera-

ted by the laws of the latter, slaves are not considered members of civil society to any purpose. (Sidney on Gov. s. 14. 2 Locke's Works, 181. 1 Harris and M'Henry's Rep. Maryland, 561, *et seq. Cunningham* v. *Cunningham,* Cam. & Norw. Rep. N. Carolina, 353. *Bynum* v. *Bostick,* 4 Des. Rep. S. Carolina, 266. Bradford's ed. N. Y. Laws, 83.)

But if the father could take, he could not transmit the land to his child. The marriage being of slaves, was not so far valid as to legitimate the issue. Such a contract is incompatible with the duty of the slave to his master. This incapacity is clear at the civil law, by which the marriage of a slave conferred no civil rights. (Grot. de Jur. Bel. et. Pac. L. 3, ch. 7, s. 5, note by Barb. id. L. 2, ch. 5, s. 15. Tayl. Civ. L. 429. 20 How. St. Tr. 27. Dom. Prel. Book, tit. 2, s. 2. Puff. B. 3, ch. 7, s. 11.) And it is equally clear with us. (*Conkling* v. *Havens,* 12 John. 314.) The child followed the condition of the mother. (*Marbletown* v. *Kingston,* 20 id. 1.)

The law will not do so idle a thing as to give the child an estate which he cannot hold. It is like the cause of an alien heir, upon whom the law will not cast land by descent for a moment. True, in *Jackson* v. *Goodell,* (20 John. 693,) a different view was taken of a grant for military services, by the late Chancellor Kent. But this view was not necessary to the decision of that cause; nor does it appear that the court proceeded upon it. If fully examined, I think it will be found a mistaken one. The people succeeded to the rights of the king, who could not make a valid grant of lands to an alien. (Jac. L. D. Alien, 11.) These military grants are no more than a grant by the crown. A legislative grant is direct; and operates *per se,* as a naturalization for the purpose of holding. The statutes authorize the commissioners to grant, but create no new capacity. A grant of the crown cannot make a new rule of inheritance. (Plowd. Rep. 335.)

But this is even stronger than the case of an alien, who may take and have heirs. A slave can do neither.

The statute of this state, (2 R. L. 210, s. 2,) never meant to vary the rights growing out of slavery. They were vest-

ed, and could not be reached by statute. But the very pas-sage of that act implies that, at common law, slaves could not contract marriage.

*Porter*, in reply. *Jackson* v. *Goodell*, (20 John. 693,) is a decisive answer to the objection that the commission-ers exceeded their authority. Consent of the master to his slave's enlistment, will be inferred, till the contrary be shown.

The Roman law is cited. With the Romans, slaves were like cattle. It is not so with American slaves. That our slaves may acquire manumission, acknowledges that they have some capacity. They are not civilly dead.

*Curia*, per WOODWORTH, J. Peter Stringerland, a slave, was a soldier in the revolutionary army, and died during the war, leaving a child, born of a woman, also a slave, to whom Stringerland had been married, before the birth of the child. From him the defendant is a *bona fide* purchaser. The lot in question was drawn by Stringerland.

The act of 1790 directed the patents to issue in the names of the persons who had actually served, and to their heirs and assigns forever; and that the lands should be deemed to have vested in the grantees and their heirs, on the 27th March, 1783.

The act of April 5th, 1803, declared that patents made to persons, who were dead in 1783, vested in those persons at the time of their deaths respectively.

In my opinion the question here presented will depend on a just construction of the patent, and the several acts of the legislature; and not on the question, independent of those acts, whether a slave has capacity to take, hold or transmit to heirs by descent. Whatever may be the disa-bilities of a slave, in these respects, in ordinary cases, I am not disposed now to apply them, if it shall appear, that in so doing, the manifest intention of the legislature would be defeated, and the objects of their bounty excluded. The circumstances of the case are peculiar, and require a libe-ral construction of the grant. The gratitude of the country

was due to the defenders of our rights in the revolutionary struggle. It was directed to the men who had rendered the service, whether citizens, aliens, or slaves. It was not intended to discriminate. The benefits derived were the same, to which ever class the individual belonged. The remuneration was intended to apply equally to all. This is necessarily to be presumed. In coincidence with this intent we find the concurrent resolutions and acts of the legislature explicit and certain. The patents are to issue in the names of the persons who served ; and to vest in them and their heirs. The commissioners of the land office had no discretion on this subject. The law was mandatory. Can it be supposed, that the party thus granting in express terms to the soldier and his heirs, intended to raise the question of disability arising from alienism or slavery? I apprehend not. The soldier being dead when the patent issued, it was in effect, a grant to his heirs. What heirs were intended ? I think, evidently, the persons who stood in such relation to him as would be entitled to inherit provided the soldier had been a free man and citizen.

The case of *Goodell* v. *Jackson*, (20 John. 693,) is in some respects analogous. The patent in that case issued in the name of an Oneida Indian who died in the war, leaving an only son. One question was, whether the heir could take ? In the opinion delivered, the Chancellor observes, " Could the government of this state have meant any other than Indian heirs ? If it was not intended for his Indian heirs, it was a void and absurd grant. Can we believe that a specific grant in fee, made by due authority of government, to an individual Indian by name, was intended to be illusory and mean nothing ? The government acted with knowledge and discretion on the occasion. They knew the character of the grantee, and they knew the services he had rendered. The honour and good faith of the state would seem to require, that the grant should have a real and effectual operation ; and be deemed to enure to the benefit of the only lawful issue of the patentee. Whether the Oneida Indians are to be regarded as aliens or citizens, appears to be quite immaterial in reference to the title

of the heir." . And again, " It is no matter in what civil or political relation to the Indian heir stood in respect to the whites ; he still took as heir ; because the government was competent to vest him with that capacity ; and the intention to do it is implied in the grant itself, which was issued by authority of law."

. Applying the same principles of construction to the case under consideration, I think we are called on to decide, that the disabilities of the patentee and the heir, arising from a state of slavery, are removed by the acts authorizing the grant. Although the word " heirs," as applicable to slaves, is inoperative ; and would so be considered in a conveyance from a freeman to a slave, it does not decide this question ; for here it is manifest to my mind, the legislature intended to place every person who had served, and was entitled to a patent, in a capacity to take, hold, and transmit the property acquired ; and that by the word " heir," in the present case, is to be understood the lawful issue of the slave ; and to confer on such issue the right of taking and alienating, with the like effect, as the heir of a freeman might do under any of these patents.

But it is contended, that the marriage of a soldier had not been legalized, and consequently the child not legitimate.

By the civil law, slaves could not take by purchase or descent. They had no heirs, and therefore could make no will. They were not entitled to the rights and considerations of matrimony ; and, therefore, had no relief in case of adultery. Nor were they proper objects of cognation or affinity ; but of *quasi* cognation only. (Taylor's Elements Civil Law, 429. Cooper's Justinian, 411, 420.) Contubernium was the matrimony of slaves ; a permitted co-habitation not partaking of lawful marriage, which they could not contract. The same disability, I apprehend will apply in the case of slaves with us. The state of slavery in this country compares with that existing under the Roman law, in many respects. The progress of society in civilization, more correct notions on the subject of moral obligation, and above all, the benign influence of the Christian religion, have soft-

ened many of the rigours attendant on slavery among the ancients. But the rights of the slave in respect to marriage and the acquisition and transmission of property by way of inheritance, remain substantially on the same ground.

Sound policy and a regard to the public morals, undoubtedly called the attention of the legislature to this subject; and gave rise to the act of Feb. 17, 1809. This act was intended to be retrospective in its operation. By so considering it in the present case, I do not perceive any well founded objection. It is not relied on here to divest any estate acquired under the law, as it was supposed to exist before the passing of the act. If, by the statute, the marriage is legalized, the effect of it is, that the state cannot resort to the doctrine of escheat; and reclaim the land granted, on the ground that the son was illegitimate, and consequently that there was no heir to take. They had the right of disclaiming a forfeiture for want of heirs; and, in my view, they have done so.

The act declares, that all marriages contracted, or which may thereafter be contracted, wherein one of the parties was, or might be slaves, shall be considered equally valid as though the parties thereunto were free, and the child or children of such marriages shall be deemed legitimate. The words are general, and extend to all marriages. Why should it be restricted to cases where the parties were then living? One object was, to render the children legitimate. What superior claims had the children of parents then living to the interference of the legislature, to those whose parents were dead when the statute was enacted? I perceive none. The words of the act are sufficiently broad to include both; and ought so to be construed, to effectuate the intent. If I am right in this construction, then the child of the soldier was legitimate, and became the heir of the father; subject, however, to every disability attending on the issue of a slave. The validity of the marriage, and the legitimacy of the issue, did not confer a capacity to inherit and transmit, not enjoyed before; but it placed the issue in a state to be considered as the heirs of the deceased, provided the disability as to inheriting should also be removed. They be-

came heirs within the meaning of the term as used in the grant; and being such, the legislature intended to remove the disabilities incident to slavery, so far as to permit the issue to take an estate of inheritance; and transmit it, in the same manner, as if no disability had existed.

I am of opinion that the defendant is entitled to judgment.

*Judgment for the defendant.*