JAMES LAVERTY, Respondent, v. JAMES MOORE, Appellant, impleaded with MARTIN R. MEEKER et al., Respondents.

The practical location of a division line by adjoining proprietors, on the faith of which valuable improvements have been made, concludes them and their successors in interest.

The rights of riparian owners are usually controlled by the relative extent of water frontage; but these are subject, like other rights, to enlargement or abridgement by contract.

Mere occupancy of a lot, under a claim of right, in virtue of a grant which does not embrace it, and made by parties who neither owned nor claimed it, is not enough to defeat a transfer of title, on the ground of adverse possession at the date of the conveyance.

A mortgage on lands which the mortgagor had previously contracted to sell, passes only his actual interest; and one who acquires his title at a foreclosure sale, takes it subject to the equities of the vendee in possession.

A vendee, who has fulfilled his contract of purchase, may obtain a decree for specific performance against parties, who, with notice of his equities, succeeded to the interest of the vendor.

A defendant cannot defeat a recovery, by setting up an outstanding right in a third party, who acquiesces in the title of the plaintiff.

A conveyance, under a decree of foreclosure, of premises not embraced in the sale, does not pass the title, though the premises were embraced in the decree.

A manifest mistake in a decree, by words of misdescription, when the premises are otherwise sufficiently identified and described on the face of a decree, does not prejudice the rights of the parties, the words of misdescription being mere surplusage.

APPEAL from the Supreme Court. The action was to enforce specific performance of a contract for the conveyance of an interest in lands in Williamsburgh, and to recover possession thereof. A decree was entered in favor of the plaintiff, and of the defendants with whom the appellant was impleaded, upon the report of the late Judge KENT, to whom the cause was referred. The decree was affirmed on appeal at the General Term in the second district, and the case is reported in 32 Barbour, 347.

. The following are the material facts found by the referee:

Francis Titus owned a farm in Williamsburgh, on the shore of the East river; and on the 1st of May, 1827, being then in possession of the whole, he conveyed by warranty deed to Noah Waterbury a block of land within the portion he

retained, fronting on and extending into the river so far as his right extended. The land he retained, as well above as below, also fronted on the river. The lot conveyed, as appears by the map, was substantially a parallelogram, except so far as it was encroached upon on the westerly end by the winding of the river; and the lot was evidently intended to be laid out at right angles with the general course of the stream, thus giving a water front corresponding with the northerly and southerly exterior lines, if projected into the river.

On the 1st of November, 1832, Waterbury, the grantee, conveyed the premises to James M. Halsey.

Four days afterwards Halsey conveyed them to James Guild, taking a bond and mortgage for $10,250, part of the purchase-money.

At the time of the conveyance to Waterbury, there was a dock or bulkhead in the river, in front of part of the lot embraced in the deed, which had been for years in the use and possession of Titus.

On the 22d of April, 1835, the legislature authorized Guild, the grantee of this lot, and other neighboring proprietors, jointly or severally, to erect, fill in and maintain a bulkhead, docks and wharves adjacent to their lands, and extending into the river as far as the permanent water line of the village, as designated on a map drawn by the city surveyor of New York.

Meantime the corporation of Williamsburgh had taken proceedings to lay out North Sixth street, and the street was run diagonally through the upper portion of the premises, leaving a small gore or triangular piece of the lot on the southwesterly side of the street, and fronting upon the river.

On the 9th of February, 1845, the plaintiff, Laverty, entered into a written contract with Guild, in which Laverty agreed to fill in the lands under water opposite the gore, and in consideration thereof Guild agreed to convey to him the undivided third of the premises thus improved. The property was described in the agreement as extending to the westerly side of the logs in the river designed for a bulkhead. These logs formed the dock or bulkhead which existed at the time of the conveyance from Titus to Waterbury.

The plaintiff filled in the lands in performance of the agreement, and Guild, after the completion of the work, repeatedly promised to convey one-third of the premises in accordance with the contract.

At the time the plaintiff commenced filling in the gore, he had a survey of the premises made, in which he was aided by Titus, and Titus placed the stakes on the southerly side of the gore, as then located and filled; and he also cut a crow foot on one of the dock logs forming the old bulkhead, to indicate the extreme southwesterly corner of the gore. Titus was then the owner of the adjoining lands on the southerly side of the gore. He was frequently on the ground while the work was in progress and made no objections; and the filling in was up to the line as located by him, and designated by the log mark and stakes.

On the 4th of May, 1837, Guild transferred all his property to Frost and Luther as assignees, in trust, to be sold for the benefit of his creditors; the plaintiff having previously caused his contract with Guild to be recorded in the office of the clerk of the county of Kings.

At the date of the contract between the plaintiff and Guild, the mortgage from Guild to Halsey, for $10,250 of the purchase-money of the entire lot, was a lien upon the gore in question.

On the 12th of August, 1837, Halsey, the mortgagee, executed to the assignees of Guild a release of this portion of the premises from the lien of the mortgage. The release purported to be in consideration of one dollar, the receipt of which was acknowledged by Halsey, who undertook to look to the balance of the mortgaged premises for satisfaction of the money remaining due on the mortgage.

On the same day the assignees assumed, in consideration of the release, to execute a mortgage to Halsey, covering the gore, and securing the payment of $1,582.

Soon afterward Halsey died, and his legal representatives foreclosed the mortgage from Guild to Halsey. Moore was made a party defendant and appeared in the action. The bill of complaint alleged that the mortgage was not a lien on

the gore, and that all that portion of the mortgaged premises lying southwesterly of North Sixth street had been released, and was not chargeable in any manner with the moneys due on the bond. The referee found, as matter of fact, that the decree directed the sale of the mortgaged premises, but excepted the gore in question. One Waterbury purchased at the master's sale, and the deed executed by the master (as it would seem by mistake), included the gore.

Waterbury, on the 3d of September, 1846, quit-claimed the gore to Martin R. Meeker and others, defendants, who do not appeal, but acquiesce in the judgment in favor of the plaintiff.

In 1841, the Meekers, who then held the mortgage from the assignees of Guild to Halsey, foreclosed and purchased the gore, but never entered into possession under their purchase. At the time of the foreclosure, Laverty, the plaintiff, was in the occupation of the lot, claiming an interest therein, and he was not made a party.

The plaintiff was in uninterrupted possession of the premises in question, claiming an interest therein from 1836 or 1837 to the 1st of May, 1843, when one Polley took possession of part of the lot, under a lease from the heirs of Titus, of lands adjoining and southeast of the gore and bounded thereon, but which did not embrace the premises in question or any part thereof, though Polley claimed that it did.

Polley assigned his lease to Ephraim Howe and Henry A. Cram, who surrendered it, taking a new lease from the heirs of Titus, but embracing only the lands before leased to Polley. White and Cram assigned in June, 1850, to the appellant Moore, who also surrendered his lease to the heirs of Titus, taking a new lease with the same description. In 1851 he sublet part of the premises to one Hovey, and in 1852 Hovey assigned to one Leeds, who took possession in 1853, and he and his assigns have since held the premises, claiming under the lease from the Titus heirs against Laverty and the Meekers.

The referee reported that the plaintiff was entitled to specific performance, and to a conveyance by the defendants of an equal undivided third of the premises, and that the defendants, Meekers, were entitled to the other two-thirds in fee.

*D. McMahon,* for the appellant.

*William Fullerton,* for the respondent.

PORTER, J.   The facts found by the referee are decisive in support of the plaintiff's right.   On the 9th of February, 1835, a sealed agreement was concluded between Laverty and Guild, by which the former undertook to fill in the premises in question, and the latter to convey to him an undivided third of the property in fee, upon the performance of this agreement.   The plaintiff fulfilled his covenant and entered into possession as vendee.   He repeatedly demanded his conveyance, and Guild promised but neglected to execute it.

The appellant Moore had never any title to the premises. The parties, through whom he sought to deduce an interest, took possession of the lot under a lease which did not embrace it, and executed by the heirs of Titus who neither owned nor claimed it.   The parcel of land, of which the premises in question formed a part, had been conveyed by Titus to Waterbury with covenants of warranty.   It was substantially a parallelogram, extending to the river, and embracing the interest claimed by Titus in the lands under water. Guild, who succeeded to the interest of Waterbury, was entitled as against Titus and those claiming under him, to the river frontage secured by this deed; and under the law of 1835, he was authorized, as riparian proprietor, to fill up the land under water in front of his lot.   It is true that by the projection of the lines of the gore into the stream, as provided for in the contract, the plaintiff acquired an interest in the lands under water, which was disproportionate as between him and Guild, the owner of the entire lot; but this was a matter in which Titus had no concern, as there was no encroachment on his side beyond the division line.   It may be that this line was not mathematically exact, but as it was located and defined by Titus himself, neither he nor those claiming under him can be permitted to question it, and to claim the benefit of improvements made on the faith of such location.   The appellant, therefore, has no title or color of title to the whole or any part of the premises in question.

Failing in establishing any interest of his own, the appellant insists that the plaintiff is barred by the foreclosure of certain mortgages, under which he claims that the title of the gore became vested either in Waterbury or the Meekers. Waterbury is not a party, and before the action was commenced, his interest, if any, was quit-claimed to the Meekers, who acquiesce in the judgment.

The rights of the plaintiff were not impaired by the foreclosure of the mortgage from Guild to Halsey. That mortgage was originally a lien on the entire lot conveyed to the latter by Titus. It was given to secure $10,250 of the consideration money on the purchase of the same property by Guild. The gore was an inconsiderable portion of the premises; and it was relieved from the lien in August, 1837, by a release from the mortgagee. The referee found, as matter of fact, that the bill of complaint, in the foreclosure suit brought by the representatives of Halsey, alleged the release of the gore, and that it was excepted in the decree authorizing a sale of the premises, though embraced in the master's deed. Upon this state of facts, it is obvious that the grantee acquired no title to the gore, and that, to the extent of the lands released, the conveyance was a mere nullity.

But the appellant insists that the Supreme Court erred in sustaining the finding of the referee, that the sale and conveyance of the released premises were unauthorized by the decree. If we were at liberty to go behind the finding of facts, we should have no hesitation in concurring with the court below in its conclusion. It is true that an error appears in the description of the premises excepted from the operation of the decree of sale. The language is, " excepting that part of the premises above described (lying *northwesterly* of North Sixth street) which has been released from the lien of the said mortgage." The word " northwesterly" should have been " southwesterly." It is an obvious clerical error, apparent on the face of the enrolled decree, the whole of which is to be read together. The complaint alleges that the part of the premises released was that " lying *southwesterly* of North Sixth street." The prayer is for a sale of the mort-

gaged property, " except that portion released by your orator as aforesaid." The decree is founded on the consent of Laverty and the other defendants that the bill be taken as confessed. It recites the master's report, that the release alleged in the complaint was duly executed for a valuable consideration. No other release is referred to in any part of the enrolled decree. The words above embraced in brackets, in which the misdescription occurs, may properly be rejected as surplusage. *Utile per inutile non vitiatur.* The exception taken by the appellant to the finding of the referee concedes " the mistake" in the decree. The master's deed, however, would have been inoperative in respect to the gore, even if the decree had authorized its sale as a portion of the mortgaged premises. The existence of a power is unavailing to aid a defect in its execution. It was shown by the master's report, that the sale he made, in fact, was of the mortgaged property, " excepting that part of the premises described as lying *southwesterly* of North Sixth street." The conveyance was, therefore, wholly inoperative as to the premises in question, which, whether excepted or included in the decree, were not embraced in the master's sale.

Equally unfounded is the claim that the plaintiff's right was barred by the sale to the defendants Meeker. They purchased under a decree for the foreclosure of the mortgage executed to Halsey by the assignees of Guild. The plaintiff was not a party to the suit, and his rights were unaffected by the foreclosure. The assignees, at most, could mortgage only the interest of Guild, subject to the equities of the plaintiff as vendee in possession, under a contract which he fulfilled. He was entitled to a conveyance, with covenants of warranty, of an undivided third of the premises in fee. All that the Meekers acquired was the remaining interest of Guild; and they therefore very properly repudiate the claim, which the appellant assumes to interpose in their behalf.

The judgment should be affirmed.

All the judges concurring,

Judgment affirmed.