STEPHEN D. ARENTS, Respondent, *v.* THE LONG ISLAND
RAILROAD COMPANY, Appellant.

1. SLAVES — MANUMISSION BY STATE LEGISLATION — TITLE TO REAL ESTATE. The provision of chapter 44, Laws of 1809, that "all persons born slaves within this state, and who have heretofore been or shall hereafter be manumitted, shall be deemed, taken and adjudged to have been capable of taking by devise, descent or otherwise, all estates, real or personal, in the same manner as if he or they had been born free," was retrospective; and on such a person becoming free by operation of the provision of chapter 137, Laws of 1817, by which all negro slaves born prior to July 4, 1799, were declared to be free from and after July 4, 1827, such person's title to real estate theretofore acquired (as, by a conveyance made in 1808) was validated.

2. EVIDENCE AS TO PEDIGREE. In establishing title to realty from a negro woman born a slave in this state, who died in 1849 aged 116, through a child claimed to have been her sole heir at law and grantee of a lost unrecorded deed, a finding that all her other children died before her is sustained by testimony to that effect of a neighbor who knew personally of the death of several of the children, but whose information as to the death of others, who died away from home, was derived from the mother and the general report in the community.

3. DEED — CHAMPERTY ACT — ADVERSE POSSESSION. In order to constitute such adverse possession as will avoid, under the Champerty Act (1 R. S. 739, § 147), a deed made by another, there must be a claim of some title or interest under some written instrument purporting to convey the lands to the claimant, or else some judgment, decree or executed process of a court.

4. RAILROAD COMPANY — ADVERSE POSSESSION. A railroad company cannot make a conveyance of right of way, with a general description as through the grantor's premises, the foundation of a claim for adverse possession of property remote from that included in the conveyance.

1

5. POSSESSION — EVIDENCE.  In an action to recover real property, the question of possession by one other than the owner of the legal title involves a conclusion of law which cannot be stated by a witness, but is to be drawn from the facts.

*Arents* v. *Long Island R. R. Co.*, 89 Hun, 126, affirmed.

(Argued April 27, 1898; decided May 10, 1898.)

APPEAL from a judgment of the late General Term of the Supreme Court in the second judicial department, entered August 5, 1895, affirming a judgment in favor of plaintiff entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James W. Treadwell* for appellant.  The deed to plaintiff, so far as it included the railroad strip, was void under the Champerty Act.  (1 R. S. 739, § 147; 3 Birdseye's Statutes [2d ed.], 2643, § 225; *Sands* v. *Hughes*, 53 N. Y. 287; *Towle* v. *Remsen*, 70 N. Y. 303, 316; *Abrams* v. *Rhoner*, 44 Hun, 507, 510; *La Frombois* v. *Jackson*, 8 Cow. 589; *Bissing* v. *Smith*, 85 Hun, 564, 570; *Scully* v. *Sanders*, 12 J. & S. 89; *Putzel* v. *Van Brunt*, 8 J. & S. 501; *Coleman* v. *Manhattan Beach Imp. Co.*, 94 N. Y. 229; *People ex rel.* v. *Storms*, 97 N. Y. 364; *Benjamin* v. *Welch*, 73 Hun, 371.)  Plaintiff failed to show title to the railroad strip.  (*Roberts* v. *Baumgarten*, 110 N. Y. 380, 385; *Lamont* v. *Cheshire*, 65 N. Y. 30, 43; *Wallace* v. *Swinton*, 64 N. Y. 188; *Simmons* v. *Havens*, 101 N. Y. 427; *Kearney* v. *Mayor, etc.*, 92 N. Y. 617; *Laftin* v. *Laftin*, 96 N. C. 94; *Little* v. *Marsh*, 2 Ired. [N. C.] Eq. 18; *Edwards* v. *Noyes*, 65 N. Y. 125; *Eisenlord* v. *Clum*, 126 N. Y. 552, 567; *Kennedy* v. *Porter*, 109 N. Y. 526; *Hudson* v. *R., W. & O. R. R. Co.*, 145 N. Y. 408; *Matter of Rogers*, 153 N. Y. 316, 326; *Bedlow* v. *N. Y. Floating Dry Dock Co.*, 112 N. Y. 263; *Healy* v. *Clark*, 120 N. Y. 642; *Collumb* v. *Read*, 24 N. Y. 509; *Jackson* v. *Lervey*, 5 Cow. 397; Code Civ. Pro. § 1500; *Hasbrouck* v. *Bunce*, 62 N. Y. 475, 481; *Thompson* v. *Burhans*, 79 N. Y. 101; *Miller* v. *L. I. R. R. Co.*, 71 N. Y. 380; *Wheeler* v. *Spinola*,

54 N. Y. 387 ; *Price* v. *Brown*, 101 N. Y. 669 ; *St. Vincent Orphan Asylum* v. *City of Troy*, 76 N. Y. 108, 113 ; *Wiseman* v. *Lucksinger*, 84 N. Y. 32 ; 1 Am. & Eng. Ency. of Law, 228 ; *Mayor, etc.,* v. *Carleton*, 113 N. Y. 284, 292 ; *Onderdonk* v. *Lord*, Hill & Denio Supp. 129 ; *Jackson* v. *Vermilyea*, 6 Cow. 677 ; *Finlay* v. *Cook*, 54 Barb. 10 ; *Northport R. E. & I. Co.* v. *Hendrickson*, 139 N. Y. 445.) The action is barred by the Statute of Limitations. (Code Civ. Pro. § 365.)

*Samuel Keeler* for respondent. The deed to the plaintiff, so far as it includes the railroad strip, was not void under the Champerty Act. To render it so, there must have been an adverse possession by defendant or its predecessors at the time of the deed to the plaintiff claiming under a specific title. (1 R. S. 739, § 147 ; *Crary* v. *Goodman*, 22 N. Y. 170 ; *Dawley* v. *Brown*, 79 N. Y. 396 ; *Pope* v. *Hanmer*, 74 N. Y. 244 ; *Laverty* v. *Moore*, 33 N. Y. 658 ; *Higinbotham* v. *Stoddard*, 72 N. Y. 94 ; *Finn* v. *Lally*, 1 App. Div. 416 ; *Chalmers* v. *Wright*, 5 Robt. 713 ; *Marsh* v. *Ne-Ha-Sa-Ne Park Assn.*, 18 Misc. Rep. 321 ; *Hallas* v. *Bell*, 53 Barb. 247 ; *Witter* v. *Blodgett*, 4 N. Y. Leg. Obs. 263 ; *Hoyt* v. *Dillon*, 19 Barb. 651 ; *Glover* v. *Manhattan R. Co.*, 19 J. & S. 1 ; *Broiestedt* v. *South Side R. R. Co.*, 55 N. Y. 220.) Plaintiff showed title to the railroad strip. (1 R. S. 738 ; *Strough* v. *Wilder*, 119 N. Y. 530 ; *Voorhees* v. *Pres. Church*, 17 Barb. 103 ; *Eisenlord* v. *Clum*, 126 N. Y. 552 ; ch. 44, L. 1809 ; *Northport R. E. & I. Co.* v. *Hendrickson*, 139 N. Y. 440.) The action is not barred by the Statute of Limitations. (*Mayor, etc.,* v. *Carleton*, 113 N. Y. 284 ; *Stevens* v. *Hauser*, 39 N. Y. 302 ; *Hunter* v. *Starin*, 26 Hun, 529.)

Haight, J. This action was in ejectment to recover a strip of land sixty-six feet wide, occupied by the defendant for its roadbed through a place called Hogshead, in the town of Hempstead, county of Queens. The defendant, by its answer, admitted that it was in possession of the land in question, but denied that the plaintiff was the owner, and alleged that the

same was owned by the defendant ; that the Statute of Limitations had run against the plaintiff's claim ; that it had held adversely for more than twenty years, and that the deed under which he claimed was void for champerty. The referee found with the plaintiff upon all of the issues framed by the pleadings.

Both parties claimed title through one John Jackson, who appears to have been the owner of a large tract of land in the town of Hempstead. The first instrument put in evidence is an ancient deed of John Jackson, Sr., of Hempstead, an innkeeper, to Obediah Jackson, whom the evidence discloses to be his son, dated March 15, 1761, in which he conveys "All my right upon Great Neck, all my lands and meadow, excepting fifty acres of salt meadow, and also all my land, clear and timbered, below the highway that leads across the Neck, and also fifty acres of plains and mills, and all the privileges thereunto belonging." The next deed from him bears date May 12, 1772, in which he conveys to his son, John Jackson, Jr., " all that part of several pieces or parcels of upland and salt meadow situate, lying and being on the south side in the patent and township of Hempstead aforesaid on the neck called *Little Neck*, and is bounded as followeth ;" then is given a particular description of several pieces of land, one of which, several witnesses have testified, embraced the lands in question. The plaintiff claims title through several mesne conveyances from John Jackson, Jr., while the defendant claims through Obediah Jackson under the former deed. There was some conflict in the evidence as to the location of the lands in question, the defendant claiming that they were located in the territory known as Great Neck and were included in the deed of John Jackson to his son Obediah ; the plaintiff claiming that they were no. part of the territory of Great Neck, but were located in that which was known as Little Neck, and were included in the deed from John Jackson to his son, John Jackson, Jr., and were not embraced in the deed to Obediah. All of the witnesses familiar with the locality agreed that the lands in dispute are within the descrip-

tion given in the latter deed. They differ as to whether it was on Little Neck or Great Neck, some claiming that the division between the two necks was the brook known as the Little Neck brook; others claiming that the Jerusalem river was the dividing line between the two territories. There is ample evidence to sustain the finding of the referee upon this question, and inasmuch as it has been affirmed by the General Term, the question must be regarded as settled, so far as this review is concerned. A very significant fact in support of the finding is that the grantor, in making his conveyance to his sons John and Obediah, described the territory conveyed to one as on Great Neck, and that to the other as on Little Neck.

On the 8th day of January, 1808, John Jackson conveyed the lands in controversy to Charity Treadwell, a black woman, and her son, Charles Treadwell. It appears that Charity Treadwell was a slave; whether manumitted by the voluntary act of her owner or freed under the statute does not appear. She lived in a small building, described as a hut, a few feet from the lands described, but she worked and tilled the land, raising vegetables thereon for upwards of forty years, and died in 1849 at the age of one hundred and sixteen years. It is now contended that the deed to her was void for the reason that a slave could not take title to, nor hold real property either by descent, grant or purchase. Such was the inexorable mandate of the common law. (*Jackson* v. *Lervey*, 5 Cow. 397.) But, in this state, prior to the execution of this deed, and as early as 1799, the legislature passed an act known as chapter 62 of that year, in which there were provisions for the gradual abolition of slavery. It provided that children born of a slave after the 4th of July of that year shall be deemed and adjudged to be born free. They were continued, however, as servants of the proprietor of their mother until the males became twenty-eight and the females twenty-five years of age. Other statutes were passed providing for the manumission of slaves after arriving at the age of forty-five or fifty years, by the voluntary act of the owners. Then followed another act in 1809, chapter 44, in which it was provided that

"All persons born slaves within this state, and who have heretofore been or shall hereafter be manumitted, shall be deemed, taken and adjudged *to have been capable* of taking by devise, descent or otherwise, all estates, real or personal, in the same manner as if he or they had been born free." And finally, by chapter 137 of the Laws of 1817, it was provided that "Every negro, mulatto or mustee within this state born before the 4th day of July, 1799, shall, from and after the 4th day of July, 1827, be free." It will thus be observed that under the statute of 1799 children born after the 4th day of July were declared to be free born, and then, by the act of 1817, all negro slaves born prior to July 4th, 1799, were declared to be free from and after the 4th day of July, 1827. Charity Treadwell was included in the latter class, and she became a free woman from and after that date. By again referring to the act of 1809 it will be observed that it applies to persons born of slaves who have heretofore been or shall hereafter be manumitted, and that such slaves shall be taken and adjudged *to have been capable* of taking by descent, devise or otherwise, real estate, etc. The act is retrospective, and such it was held to be in the case of *Jackson* v. *Lervey* (5 Cow. 397) so that as soon as Charity Treadwell became a free woman her title to real estate theretofore and thereafter acquired could no longer be brought in question.

It appears that Charity Treadwell had a number of children, all of whom she survived with the exception of her daughter Mariah, who married a man by the name of Carman. Some criticism is made with reference to the evidence of the death of the children of Charity. It was given chiefly by an old colored woman, who lived at Hogshead and was a neighbor of Charity. The death of several of the children she knew of personally, but some took place away from home and her information was limited to that which had been told her by the mother and the general report in the community. It must be borne in mind that Charity died in 1849, and that she then was one hundred and sixteen years of age. It is, therefore, not surprising that she survived her children with

the single exception. It is quite evident that the persons in being who could have known anything of her family's history must be limited, and of necessity much of the information with reference thereto must have been derived through persons now deceased. (1 Greenl. on Ev. §§ 103, 104 ; *Eisenlord* v. *Clum,* 126 N. Y. 552–563.) The referee has found not only that Mariah Treadwell was the only surviving child of Charity and her heir at law, but has also found that Charity on the 7th day of August, 1849, conveyed the premises to Mariah and her husband, Carman. This deed was not recorded and has been lost. It is recited, however, in a deed given by the Carmans to one Christian Shultz, and this was supplemented by the testimony of one Seman, whose grandfather was a judge of the Court of Common Pleas, who testified that on one occasion he with his father were examining the papers of his grandfather, which had been preserved in a trunk, and that there he found a deed from Charity Treadwell to Carman and his wife, which covered this property The evidence may be slight, but we are inclined to the view that it is sufficient to sustain the finding. The other conveyances reaching the plaintiff have not been questioned, except that they are claimed to be void under the Champerty Act. The defendant's railroad had been constructed only nineteen years, and it, therefore, was not in a position to avail itself of the Statute of Limitations or the defense of adverse possession for twenty years.

The statute provides that " every grant of lands shall be absolutely void if, at the time of the delivery thereof, such lands shall be in the actual possession of a person claiming under a title adverse to that of the grantor." (1 R. S. 739, § 147.) The deed to the plaintiff bears date October 15, 1867. The defendant's road was constructed in 1864. It must, therefore, be conceded that at the time the plaintiff took his deed the defendant was in possession, but did he hold it adversely ? In order to constitute such adverse possession as will avoid a deed, there must be a claim of some title or interest under some written instrument purporting to convey the lands to

the claimant, or else some judgment, decree or executed process of some court. (*Crary* v. *Goodman*, 22 N. Y. 170; *Laverty* v. *Moore*, 33 N. Y. 658; *Dawley* v. *Brown*, 79 N. Y. 390; *Chalmers* v. *Wright*, 5 Robt. 713.) Had the defendant such an instrument? The paper upon which it relied was executed by one Jacob S. Jones, who claims title through the deed given by John Jackson to his son Obediah of real estate in Great Neck. It provides that "in consideration of one dollar to us in hand paid, the receipt whereof is hereby acknowledged, and of the benefits and advantages we are to derive from the construction of the South Side railroad, and in consideration of the building of said road within two years, we do hereby agree with each other, and with the South Side Railroad Company of Long Island, to grant and transfer to the South Side Railroad Company the right of way over a strip of land in width not exceeding sixty-six feet over and through lands respectively owned by us, as laid out on the general line designated on a map of said road as now prepared by Samuel McElroy, engineer, and as the same may be finally and definitely located by the engineer of said company." The defendant has succeeded to the rights of the South Side Railroad Company, but is there any reference in this instrument to the lands in controversy? We fail to discover it. True, Jones has given to the railroad company the right of way sixty-six feet wide through the lands owned by him as the road is laid out and designated on a map prepared by the engineer. Further than that it does not go. If, as has been found, the lands of Jones derived through the deed from Obediah Jackson were on Great Neck, and did not include the lands in question upon Little Neck, then this instrument affords no paper title upon which the right of adverse possession can be founded. Were it otherwise, a company owning a railroad could make a conveyance with a general description as through the grantor's premises, the foundation of a claim for adverse possession of property remote from that included in the conveyance. The question, therefore, resolves itself into one of fact, and that is, did the deed of 1761 to Obediah

Jackson embrace the lands in dispute? If it did not, the defense of champerty must fail. That question, as we have seen, was found in favor of the plaintiff, and, as we have shown, upon ample evidence to sustain it.

In an action to recover real property the person who establishes a legal title to the premises is presumed to have been in possession thereof within the time required by law, and the occupation of the premises by another person is deemed to have been under and in subordination to the legal title, unless the premises have been held and possessed adversely to the legal title for twenty years before the commencement of the action. (Code Civ. Pro. § 368.)

Upon the trial a witness was asked by the defendant: " Since your mother's death who has been in possession of this farm that was cultivated by your grandfather?" To this an objection was interposed, which was sustained. The defendant then offered to prove by this witness that he had been, for more than twenty years prior to the commencement of this action, in possession of the greater portion of the farm cultivated by Obediah Jackson, including the premises described in the complaint; that he was in possession, claiming title to the farm and to the premises described in the complaint, in fee simple, etc. It was excluded and an exception was taken. The referee had been careful to admit in evidence all the acts of the parties tending to show possession. He had permitted evidence to be given showing whether the premises were fenced, when and how cultivated, and what was done upon the land from time to time. The question as to whether the witness was in possession was a conclusion of law to be drawn from the facts. The ruling was proper. (*Miller* v. *L. I. R. R. Co.*, 71 N. Y. 380, 385.) Other exceptions were taken to the admission and rejection of testimony and to the findings of the referee, but they point to no error requiring a reversal.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.