1814.
*Philadelphia,*
*Saturday,*
January 1st.

## The Commonwealth ex relat. SUSAN STEPHENS against CLEMENTS.

An indenture of service made by a *feme covert* slave, in consideration of her manumission, is good.

THIS was a *habeas corpus* issued to *Joseph Clements,* to bring up the body of *Susan Stephens,* in his custody, together with the cause of her detainer. The defendant made return, that he held her as a servant by indenture dated the 3d *September* 1813, by which she bound herself to serve him for the term of three years. The writ was returnable before the Chief Justice; and in consequence of its novelty, the case was heard before the whole Court.

It appeared in evidence, that *Susan Stephens* was a black woman, formerly the slave of *William Maxwell* of *Kent* county in the state of *Maryland;* and that she ran away from her master, and came to *Philadelphia,* where she married *George Stephens* a free black residing there. *Maxwell* afterwards came to the city, apprehended the woman, had her in his custody as his slave, and was about to carry her to *Maryland,* when *Joseph Clements,* at the solicitation of both

the husband and wife, agreed to pay *Maxwell* 195 dollars, provided he would manumit the wife, it being at the same time understood, that the husband, and wife should bind themselves as servants to *Clements* for the term of three years. In pursuance of this agreement, *Clements* paid *Maxwell* the money, *Maxwell* executed a deed of manumission, and *Stephens* and his wife bound themselves by separate indentures to serve *Clements* for three years. The indenture of the wife was executed before an alderman of the city, her husband being present, and consenting, but not being a party. It was also executed by *William Masters*, one of the society for promoting the abolition of slavery, who was styled the next friend of the wife. The indenture was expressed to be made in consideration of the manumission of *Susan Stephens* by the said *Maxwell*, and of 195 dollars paid to him by the said *Clements*. At the time of the transaction, *Susan* was in a state of pregnancy.

*Shoemaker* for the relater. The indenture of service is void, having been made by a married woman. At common law and by general principle it is clearly so; and therefore it is incumbent upon the master to shew some written law, that will take the case out of the common rule. Written law there is none; and the absence of it in a state where the most signal efforts have been made in favour of the blacks, is evidence that the legislature did not intend to disturb the common law, considering it perhaps as beneficial to the black to remain in her original condition, as to be under the control of her master and her husband as to the terms of her manumission. Although the husband consented in this case, his consent is of no avail. A husband has no authority to transfer, or to consent to the transfer of his wife's services. The only instance in which our law permits husband and wife to bind themselves to service, is in the case of *German* redemptioners, which is provided for by the acts of 8th *April* 1785, 2 *State Laws* 325, and 22d *April* 1794, 3 *State Laws* 557. A special provision for such a case, excludes other cases: and even in relation to redemptioners, the rule of construction applied to the acts is extremely strict. The indenture must be made in precise conformity to them, or it is void. *Commonwealth* v. *M'Corkle (a)*.

(a) *Browne's Rep.* 295.

*Hopkinson* contra. At the time of the agreement, in consequence of which the manumission and indenture were made, *Susan Stephens* was not a married woman. Her cohabitation with *Stephens,* was what the civil law called *contubernium,* not *connubium.* It did not partake of lawful marriage, because being a slave she could not contract it, or in any way remove herself from the legal control of her master. *Cooper's Just.* 420. She was still a slave; her issue would have been a slave, and it is in reference to such a case that the law must be considered. The indenture was good, then, because it was a fair contract for a reasonable term of service, made with the consent of her husband, and in consideration of freedom. The ordinary rules of law are not applicable to slaves in this state. The incapacities of a slave are such, that according to general principles he can make no contract; yet no one ever doubted that a contract of service entered into by an unmarried slave in consideration of freedom, was binding: and under what greater incapacity does a married slave lie than a single one? The disabilities of slavery merge all others; and if the law in this country has adopted a rule that puts aside the greater disability, in order to give the slave an opportunity of procuring his freedom, it will of course consider marriage, which is a less restraint, as subject to the same rule. The instances in which our law has from convenience left the common law, are numerous. It has done so particularly as to conveyances by *femes covert,* which from the first settlement of the province were made without the ceremonies of a fine. The incapacities of a *feme covert* are intended for her protection; they never should be permitted to stand in the way of her emancipation from slavery. But with what propriety can this woman question this contract? The manumission and the indenture were one act. If the indenture had been to her master, it is impossible that the manumission could have been good, and the indenture void; and it is the same as to the master, when it is made with his consent to a third person, who pays him the price of freedom at the solicitation of the slave, and in consideration of the indenture. If she is therefore not bound as a servant, she is still bound as a slave; and she is of course applying to this Court, to be restored with her offspring to the condition of slavery.

1814.

COMMON-
WEALTH
v.
CLEMENTS.

TILGHMAN C. J. after particularly stating the facts, delivered his opinion as follows:

It is not denied by the counsel for *Susan Stephens* that by the law of this state, a negro slave under the age of twenty-one years, may in consideration of a manumission bind herself till the age of twenty-eight years, or for the term of seven years, if above the age of twenty-one, at the time of executing the indenture. But he rests his client's case on the circumstance of her being a married woman at the time of binding herself. The general principle undoubtedly is, that the deed of a married woman is void. Yet this rule is not without exceptions. On the first settlement of *Pennsylvania*, when land was not of much value, and business was transacted with less form than at present, a practice prevailed for married women to convey their rights to land by a *common deed*, in which they were joined with their husbands. These conveyances were held good, though against the principles of the common law of *England*. It has always been the policy of our government to encourage emigrations from *Europe*, and in order to facilitate them, husband and wife have been permitted to be bound to service for a term of years, to enable them to raise money to pay for their passage. It appears by an expression in the 13th section of the act of 22d *April* 1794, (for regulating the importation of *German* and other passengers &c.) that this kind of servitude was *by custom*. In both these instances, it was thought reasonable to break through the rule of the common law, and yet in neither of them was the interest of the wife so much consulted, as in the case now under consideration. It is indeed a case *sui generis*, to which the common law of *England* furnishes no parallel. In the first place, neither *Susan Stephens* nor her husband could acquire any rights by marriage in derogation of the rights of her master, who retained the absolute control over her person and her services. He had a right to separate her from her husband, and carry her to *Maryland*. Her situation is so totally different from that of a free woman, that the same principles of law cannot suit the conditions of both. If the common law adjudges the deed of a married free woman to be void, it is because she is supposed to have no will of her own, being under the power of her husband. She

is not permitted to obligate herself therefore, even with the consent of her husband, lest she should be induced to act not according to *her own* will, but to *his* will. The principle is established for her protection. But the slave is under the power not of her husband, but her master. Now suppose the master had been willing to relinquish his rights so far as to give freedom to his slave, on condition she would serve him for three years. Can it be doubted, that the law would permit her to make a contract, by which she would be so great a gainer? If the contract had been prohibited, she as well as her child must have remained slaves for life. So that this same principle which protects a free woman, would oppress a slave, by preventing her acquisition of freedom. I can have no doubt therefore but that in case of a slave, the general principle of the common law is to be rejected, and a new principle adopted, calculated for the condition, and operating for the benefit of the slave. I consider the case of *Susan Stephens* the same in substance, as if she had been bound to serve *Maxwell*, her former master; because the manumission by him, which is the consideration of the indenture of servitude, was produced by *Clements'* money, so that in fact she owes her freedom to *Clements*. I am of opinion therefore, that the indenture is binding, and that *Susan Stephens* be delivered to her master *Joseph Clements*.

YEATES J. The particular facts of this case have been detailed by the Chief Justice. It cannot be doubted, that the contract of servitude made by *Susan Stephens*, with the full consent of *George Stephens* her husband *de facto*, was highly beneficial to herself and the child whereof she was then pregnant. She was the acknowledged slave of *William Maxwell* of *Maryland*, had run away from him, contracted marriage without his permission here, and being apprehended, her master was in the act of removing her to *Maryland*. If this design had been executed, both she and her child would certainly have become slaves for life. Whatever may be our ideas of the abstract right of detaining our fellow creatures in slavery, that relation is recognized by most of the states in the union, and is tolerated *sub modo* in this government. A temporary servitude of three years in *Pennsylvania*, has

been substituted by this new indenture, for the horrors of slavery, to which this woman and her infant would otherwise be legally subjected in *Maryland.*

The objection therefore against the validity of this indenture, that at the time *Susan* executed it she was a married woman, is repelled by the fact that this intermarriage was unlawful. As a slave she was incapable of entering into a contract of marriage without the master's consent. Such are the deplorable effects of slavery, from which *Susan* has fortunately been manumitted. A slave, by running from her master in a neighbouring state, cannot derogate from the rights of her master, nor obtain additional rights to herself incompatible with those of her master.

But I go much further. We have adopted the common law of *England* so far as it is applicable to our local situation and circumstances, but no further. Slavery is unknown in *England,* and therefore arguments deduced from their law as to slaves, can afford no useful information. The usages and customs which have obtained amongst ourselves are well known to have influenced the decisions of our courts of justice against the known law of *England.* This appears clearly from *Davy et uxor's Lessee* v. *Turner,* and *Lloyd's Lessee* v. *Taylor,* 1 *Dall.* 11. 17. Now we well know that minors, husbands and wives coming from *Germany, Holland* and *Ireland,* have often bound themselves as servants for limited periods, in consideration of their passages from *Europe,* and such indentures have always been deemed valid. The same remark may be made of contracts entered into by people of colour standing in the relation of husband and wife, and of minors, where there has been a fair and honest consideration paid, and no undue advantage taken of their situation and ignorance. That this contract was fair in all its parts, advantageous to both husband and wife, who will not be torn from each other, and to their child also, is unquestionable. That *Clements* should be subjected to the loss of 200 dollars paid to *William Maxwell* for the manumission of the woman, is against all equity and good conscience, I cannot possibly doubt. I am therefore clearly of opinion, that *Susan Stephens* be remanded to the custody of her master.

1814.

COMMON-
WEALTH
*v.*
CLEMENTS.

BRACKENRIDGE J. I have read an account of a case, real or fictitious, I will not say which, decided in some country under the civil law, which has been generally received as a ground of the law of nations; and this question which respects the rights of a *slave*, cannot but be considered as having some relation to the law of nations, or at least authorities of general law may be read in the case. The case to which I refer, and have in my mind, was said to be as follows:

A person passing by a pool, missed a foot and slipt in. He was over his depth, and the bank was steep. A shepherd observing him from a height, hastened to his assistance, and entangling his crook in the garments of the drowning man, drew him out. But in attempting to fix his crook in the first instance, he had hurt the eye of the stranger in the pool, and which afterwards occasioned the loss of it. The stranger so rescued, brought his suit and claimed damages; for it is a principle of our law, derived from the civil, *Southcote's case, Coke, Coggs* v. *Barnard, Ld. Raymond,* and *Jones on Bailments,* that even *voluntary service* and without reward, if *unskilfully performed,* may partake of the nature of injury, and require damages.

The Court decided, that the plaintiff should have his election to go back to the same pool, and put himself in the same place, and after having struggled a while and being half drowned, if he could get out of himself and without help, he might come back and prosecute his action; this he declined, and was nonsuited. I would propose to give the applicant in this case the like election, which is to annul the evidence of her manumission, and procure her indenture to be taken up, and to put herself in her master's hands, as at the time when she was taken out of his possession, if this can be done. If she cannot do this, or procure it to be done, her complaint under this *habeas corpus* must be dismissed.

Prisoner remanded.