## MARY TIMMINS v. SARAH LACY ET AL.

Upon the question of jurisdiction the cases of Arberry v. Beavers, 6 Tex., 457, and Baker v. Chisholm, 3 Tex., 157, were examined and quoted at length, to show that they related to the special limited duties under discussion. (Paschal's Dig., Notes 182, 433, 604.)

The first section of the act of 1866, about apprentices, declares, that "in all applications for apprenticeship, ten days' notice, as in the case of guardianship, shall be given, and no minor shall be apprenticed except at a regular term of the court." (See the act, *post* p. 119.) But the county court does not derive its powers to apprentice from the statute by which the exercise of jurisdiction is regulated, but from the constitution, which gives it as clearly and positively as any other branch of the jurisdiction. (Paschal's Dig., p. 935, sec. 6.)

It follows that the jurisdiction is over an inferior tribunal, by the exercise of a general superintendence and control, with the right, when necessary, to issue the writs of injunction, *certiorari*, &c. (Paschal's Dig., p. 935, sec. 6, and Note 182, p. 57.)

The 16th section of the IVth article of the constitution of 1866, gives the power to the county courts to apprentice minors under such regulations as may be prescribed by law. (Paschal's Dig., p. 937, sec. 16.) And while the 6th section of the same article does not expressly give appellate jurisdiction as to this subject-matter, yet it is within the superintendence and control of the district court. (Paschal's Dig., p. 935, sec. 6.)

The most that could be said is, that if an appeal does not lie from the county court, its action may be brought into exercise by *certiorari*.

It is a universal principle of the common law, that the father of a bastard has no parental power or authority over such illegitimate offspring.

A bastard is a child born out of lawful wedlock.

And there can surely be no lawful wedlock between parties who are under disability, and cannot exercise the freedom of consent essential to every contract.

Slaves could not marry, even with the consent of their masters, so as to constitute them husband and wife, and protect them from being witnesses against each other; they could not take property by purchase or descent; they had no heirs, and could make no will; they were not entitled to the rights and considerations of matrimony, therefore they had no relief in cases of adultery; they were not the proper objects of cognation or affinity, but of *quasi* cognation only; contubernism was the matrimony of slaves, a permitted cohabitation, not partaking of lawful marriage, which they could not control.

The state of slavery in this country compared with the Roman law in many respects. The progress of society in civilization, more correct notions on the subject of moral obligation, and, above all, the benign influence of the christian religion, have softened many of the rigors attendant on slavery among the ancients. But the rights of the slave, in respect to marriage and the acquisition of property by way of inheritance, remain substantially on the same ground.

The chief justice quoted, and inclined to approve, the opinion of MATTHEWS, J., that while in a state of slavery marriage could produce no civil effect, because slaves are deprived of all civil rights, yet that emancipation gives to a slave his civil rights; and a contract of marriage, legal and valid by the consent of the master, and moral assent of the slave, from the moment of freedom, although dormant during slavery, produces all the effects which result from such contracts among free persons.

The object and purpose of our apprentice law was to give to parents or guardians of minor children, subject to their control, and for whose care and nurture the courts provide, the right of consent. But the father who had abandoned his wife and children has no power to rob the mother of the child, and direct its apprenticeship.

The trial in the district court was *de novo*, and the judgment was affirmed, without settling the general practice upon a *certiorari* in such cases.

APPEAL from Cherokee. The case was tried before Hon. REUBEN A. REEVES, one of the district judges.

This case introduces a new feature in the history of Texas jurisprudence. There was literally nothing in the laws of the republic in relation to apprentices. The 44th section of the act of 20th March, 1848, relating to guardians and wards, reads as follows:

"When a minor shall have no parents living, and no estate, the chief justice shall have power, without the ap-

pointment of a guardian, to bind out such minor to some suitable person who will undertake the support and education of such minor; if a male, until he shall arrive at the age of twenty-one years; and, if a female, until she shall marry, or arrive at the age of twenty-one years, which ever shall first happen; and when any such minor shall have property, but not sufficient for his support and education, the chief justice may authorize the guardian of such minor to bind out such minor under the like rules and regulations." (Paschal's Dig., Art. 3927.)

And by the 39th article of the Penal Code, apprentices were put in the same category with children and slaves, as to offenses perpetrated at the instance of parents, guardians, or masters. (Paschal's Dig., Art. 1641.) These were the whole of our laws in reference to apprenticeship. And practically these two sections were dead letters. The jurisdiction was rarely, if ever, exercised by the county courts. In a country of such plenty, and where livings were so easily obtained, orphan children were generally provided for by the early marriages of widows; by the kindness of some relative or friend; and, more generally, by becoming *men* at ten or fifteen years of age.

Our educational system paid for their tuition at any public school in the state. In the country, they remained upon farms and took to stock-raising, farming, driving teams, or hunting, as best suited their tastes. In the cities, they learned to set type, or handicraft with established mechanics; or else they turned to be merchants' clerks, law or medical students, never being charged for tuition, and not often for board or clothing; or, if religiously inclined, they took to preaching without preparation. The sufferings of orphans or begging by them was unknown. And while they were rarely hired to work, there was no such thing as "going out to service." The *Reporter* takes this occasion, once again, to repudiate the "great lie," that to work was a degradation in the South, and that orphan

children grew up in idleness or as vagabonds. Nor is it true, as a rule, that the children of the well-to-do people did not labor. In truth, in the South, as in all the rest of the world, to labor in some way was the rule; to be idle, the exception. There were few organized charitable institutions; but there was a great deal of hospitable charity in taking care of the children of deceased relatives and friends, and bringing them up with tolerable educations. And while slavery had its great evils, (and what civilization. has not,) no system of property was better adapted to keeping families of deceased fathers together than that system. It was far more generally distributed than is usually believed. To own few slaves was the rule; many, the exception. Of the three hundred and fifty thousand slave-owners in the whole South, one hundred and sixty thousand owned from one to three, and one hundred thousand from three to ten. When the humane slave-holder died, (and all small slaveholders, as a rule, worked with their slaves and were humane,) none were so anxious about the children as the faithful slaves. These, with the aid of the widows and children, generally "worked out the debts," and the farms went along better than they had with thriftless masters. And among that far more numerous class, the six millions whose families were unconnected with slavery by ownership, to be busy laborers was the general rule. They included among them divines, physicians, lawyers, editors, teachers, printers, engineers, all sorts of carriers, merchants, hotel-keepers, mechanics of every art, manufacturers, officers of every grade, professional politicians, overseers, and the vast numbers of small farmers who really made up the great agricultural strength of the southern states.

No eight millions of civilized people were so moral, none more independent. The "poor white trash" was more a thing of imagination than reality. Next to the "great lie," that the white man never worked in the South,

was the shameless one, that the family without slaves had no social or political influence in southern society. Society there, as elsewhere, was greatly controlled by the learned professions and men in commercial life, or those callings which bring them into constant contact with the public. These were not the wealthy planters, by any means, but the classes before mentioned. .

The orphans of those without slaves almost always found friends, who gave them employment until they took to professions, like our Crawfords, McDuffies, Clays, Houstons, Grundys, Johnsons, Hamiltons, Lipscombs, Arringtons, and hosts of other great lights, who have added lustre to the nation. Indeed, we have few who have won renown in the southern states, who, as boys, did not labor on the farms, or in some other manual way, which gave constitutions and habits of application and conscious self-reliance.

The sudden emancipation of four millions of illiterate people, who had hitherto been slaves—a people without property, money, or book-learning—required some change of legislation. It is not to be denied, that the shock was a great one, and that it distracted the minds of many, and caused inventions, as to how the labor should be controlled for the benefit of the old masters. Although most men had long felt, few were willing to acknowledge, that slavery was a very expensive institution of the master.

The legislature of Texas adopted an apprentice law as a remedy for this change. As it is printed in no digest as yet, and the case turns upon several of its sections, the act is here printed in full:

"AN ACT establishing a general apprentice law, and defining the obligations of master or mistress and apprentice.

"1. It shall be lawful for any minor to be bound as an apprentice, by his or her father, mother, or guardian, with their consent, entered of record in the office of the clerk of the county of which the minor is a resident, or without such consent, if the minor, being fourteen years of age,

agree in open court to be so apprenticed: *Provided,* There be no opposition thereto by the father or mother of said minor.

"2. It shall be the duty of all sheriffs, justices of the peace, and other civil officers of the several counties of the state, to report to the judge of the county court of their respective counties, at any time, all indigent or vagrant minors within their respective counties or precincts, and also all minors whose parent or parents have not the means, or who refuse to support said minors; and thereupon it shall be the duty of the county judge to apprentice said minor to some suitable or competent person, on such terms as the court may direct, having particular care to the interest of said minor.

"3. All indentures of apprenticeship shall be approved by the county judge, and entered of record in the office of the county clerk of the county of which the minor apprenticed is a resident; and the county judge shall have exclusive jurisdiction of all causes of action growing out of the relation of master or mistress and apprentice.

"4. The term of apprenticeship of every minor under this act shall be until the minor attains the age of twenty-one years, unless sooner married: *Provided,* That in all cases where the age of the minor cannot be ascertained by record, or other satisfactory testimony, the judge of the county court shall fix the same.

"5. It shall be the duty of the county judge, upon making the order of apprenticeship, to require the master or mistress to give bond, in such sum as he may direct, with one or more good and sufficient sureties, payable to the county judge and his successors in office, conditioned that he or she shall furnish said minor sufficient food and clothing, to treat said minor humanely, to teach or cause to be taught him or her some specified trade or occupation, to furnish medical attendance in case of sickness, and for general and faithful compliance with the terms stipulated

in the indentures as to education, &c.; and in default of
the master or mistress to comply with the stipulations of
his or her bond, suit may be instituted by the father,
mother, or guardian of the minor, or by the county judge,
upon the same, for all damages sustained; and such dam-
ages, when recovered, shall be applied to the use and ben-
efit of the apprentice, under such regulations as may be
prescribed by the county judge.

"6. In the management and control of an apprentice,
the master or mistress shall have power to inflict such
moderate corporeal chastisement as may be necessary and
proper.

"7. If any apprentice shall run away from, or leave the
employ of, his master or mistress, without permission,
said master or mistress may pursue and recapture said ap-
prentice, and bring him before any justice of the peace of
the county, whose duty it shall be to remand said appren-
tice to the service of his master or mistress; and in the
event of a refusal on the part of said apprentice to return,
then said justice shall commit said apprentice to the county
jail, on failure to give bond for appearance at the next term
of the county court; and it shall be the duty of the county
judge, at the next regular term thereafter, to investigate
said cause, and if the court shall be of opinion that said
apprentice left the employment of his master or mistress
without good and sufficient cause, to order him to receive
such punishment as may be provided by the vagrant laws
then in force, until said apprentice agrees to return to his
employment: *Provided,* That the court may grant contin-
uances, as in other cases: *And further provided,* That if the
court shall be of opinion that said apprentice has good
cause to quit said employment, the court shall discharge
said apprentice from his indentures of apprenticeship.

"8. In case any master or mistress of any apprentice
may desire, he or she shall have the privilege to summon

his or her apprentice to appear before the county court of the county in which the parties may reside, and on good and sufficient cause being shown to said court, and on proof that said apprentice will not be injured thereby, shall be released from all liability, as master or mistress of such apprentice, and his bond canceled.

" 9. It shall not be lawful for any apprentice, bound under the provisions of this act, to reside out of the county in the office of which the terms of indenture are required to be recorded, without the written order of the county judge, entered of record in the clerk's office of the county court of such county; when such leave is obtained, a certified copy of the order authorizing the same shall be filed for record in the office of the clerk of the county court of the county wherein the residence is to be; and the county judge of that county shall have plenary power to hear and adjudicate all causes of action between the said master or mistress and apprentice, as fully as the county judge of the county wherein the indentures of apprenticeship were originally recorded.

" 10. Any apprentice who shall be removed out of the bounds of the county having original jurisdiction of the same, by his master or mistress, or with his knowledge or consent, without leave first obtained from the county judge, and shall be retained thereout for a longer period than thirty days, shall not be held liable for a further compliance with his indentures, and can only be retained by the master or mistress at the pleasure of said apprentice.

" 11. Any person who shall knowingly and willfully entice away an apprentice, or conceal or harbor a deserting apprentice, shall, upon conviction thereof, pay to the master or mistress five dollars ($5 00) per day, for each day said apprentice is so absent or concealed from his master or mistress, and shall likewise be held liable for all damages proved to have been sustained by the master or mistress on

account of such willful concealing, harboring, or enticing away, to be recovered by suit before any court having jurisdiction of the same.

"12. The county judge shall have power to hear and determine and grant all orders and decrees, as herein provided, as well in vacation as in term time; *Provided,* That in all applications for apprenticeship ten days' public notice, as in case of guardianship, shall be given, and no minor shall be apprenticed except at a regular term of said court.

"Approved October 27, 1866."

This suit originated in the county court of Cherokee county, by application filed by appellant, Mary B. Timmins, on the 14th January, 1867, to have apprenticed to her, under the 1st section of the general apprentice law, [*ante,* p. 119,] Elkin, a minor child of said appellee, Sarah Lacy, which application is in words as follows, to wit:

"Your petitioner, Mary B. Timmins, of the county and state aforesaid, represents to your honor, that there is a certain minor, (freed child,) Elkin Pope by name, aged fourteen years, who has been for some time, and is now, living on her premises, and under her protection and maintenance; that his father, Harry Pope, is not able to afford said minor that paternal protection and maintenance which nature and society demand; in view of which fact, he gives his full consent to the apprenticeship of said minor to petitioner. Premises considered, petitioner prays, that said minor be bound to her as an apprentice until he is released from the disabilities of minority, promising a faithful compliance with the requisitions of the law on the subject of apprentices, and as in duty bound," &c.

The applicant afterwards, on the 29th January, 1867, amended said application, by alleging that said minor, Elkin, was only thirteen years of age.

On the 29th January, 1867, the appellees, on the ground that the appellee Sarah was the mother of said minor,

and the appellee Moses was the husband of Sarah, appeared in court, and excepted to the proceedings, as follows:

"And now come Moses and Sarah Lacy, in the matters of the application of Mary B. Timmins, praying for the apprenticeship of Elkin Pope, and allege that the said Sarah Lacy is the mother of said Elkin Pope, so called in plaintiff's application, but whose true name is Elkin Lacy, and that said Moses Lacy is the husband of the said Sarah Lacy, and except to the petition of the said Mary B. Timmins, and say that the matters and things therein contained are wholly insufficient to entitle them to the apprenticeship of said minor. And for special exception say that said application is not made under any provision of the statute in such cases made and provided," and also filed the following answer, to wit:

"And now come Moses Lacy and Sarah Lacy, wife of the said Moses, and both free people of color, and for answer to the petition of Mrs. Mary B. Timmins, filed in this court January 14, 1867, praying the apprenticeship of Elkin Pope, minor, to the said Mary B. Timmins, say: That they deny all and singular the statements, allegations, and averments in said plaintiff's petition contained; and for further answer, respondents state that they are the legal parents of said minor, Elkin, and are legally and rightfully entitled to the care and control of their said child. Respondents say that the said Harry Pope, mentioned in plaintiff's petition, is not the legal father of said minor, Elkin, and that the said Elkin is above the age of fourteen years. Respondents further say, that they are residents of Cherokee county, and have a comfortable home, with provisions amply sufficient for the support of themselves and family, and sufficient clothing for their comfort, and that they and their said children are hired for reasonable wages for the year 1867. That, besides their own labor, they

have four children large enough to do good work, and would be capable of earning a decent support, besides wages, to the amount of $200.

"Respondents further state, that after securing homes for themselves for the year 1867, their employer, not wanting the services of their said children, they hired them out in their immediate neighborhood to competent men, for reasonable wages, besides their necessary food, clothing, and medical attention in case of sickness.

"Respondents further state, that they are fully competent to support their said children, if they can be let alone and are permitted to have the management and control of them.

"Respondents further say, that they protest and object to the apprenticeship of their said child to any one, but do say, that if said Elkin must be apprenticed, they prefer that your honorable court bind him to William T. Long, of Cherokee county. The premises considered, respondents pray that they have the possession of their child, or, in case they cannot have such possession, that he be apprenticed to said Long, and for general and special relief," &c.

At the January term of the county court, the exceptions of respondents were overruled; and, after hearing the evidence, said minor was by the court ordered to be apprenticed to Mary B. Timmins. From this order the contestants obtained a writ of *certiorari*, and had the cause removed to the district court of Cherokee county.

Upon the trial in the district court, the case was heard *de novo* by the judge "upon the facts and the law," and the following facts were proved: [For accuracy, the *Reporter* prints the statement of facts from the record.]

"This cause coming on to be heard, the following facts were proved by the plaintiff, to wit: That about fifteen or sixteen years ago, the said Sarah Lacy was married, after the usual fashion of negro marriages, to one Harry Pope,

also a negro, both being then slaves; that the boy Elkin, the subject of this controversy, and two other children, were the fruits of said marriage; that eight or ten years ago the said Harry abandoned the said Sarah, because she had a child by another negro; that he was and has ever been the acknowledged father of said children; that he gave his written consent, which was filed in the probate court, for said children to be apprenticed to their former mistress, who is the plaintiff in this suit, to wit:

"THE STATE OF TEXAS, ⎫
  " *County of Cherokee.* ⎭

"To ALL WHOM IT MAY CONCERN:

"These presents witness, that I, Harry Pope, hereby agree and consent that my sons, Elkin Pope, Chuff Pope, and my daughter, Leney Pope, all minors, may be, and it is my wish that they should be, apprenticed and bound by the county judge of Cherokee county to Mrs. Mary B. Timmins, of said county, during the years of their minority.

"Witness my hand, this the 27th day of December, 1866.

"Attest:                his
                    HARRY ✕ POPE.
  "F. M. POPE,         mark.
  "J. H. WIGGINS.

"That the condition of said agreement was, that the said Mrs. Timmins should give to each of said minors one hundred acres of land on their arriving at the age of twenty-one years. That the said Mary B. Timmins agreed to comply with this condition, and to so obligate herself in her bond. That the said Harry had been for a long while separated from said children by having been sold as a slave; that after the said Harry had been thus sold he often visited his said children. That after the war closed, and negroes were freed, he contracted with Mrs. Timmins to let her keep said children during the year 1866; also, that

after giving his consent for said children to be apprenticed, he had made a contract with said plaintiff to let said children remain with her during the year 1867, also for the year 1868, if she desired it.   That she was to pay the said Harry such price as he (Harry) might think their labor was worth for the time they should so remain.   That the said Sarah had also contracted with the said Mary B. Timmins, and hired herself and said children to said plaintiff for said year 1866.   That she and the said Moses Lacy had left the premises of said Mrs. Timmins in December, 1865, in violation of a contract with said party to work for her during said year 1866.   That said Mary B. Timmins was and is a very worthy and competent person to have the control, education, and raising of said children.   That said Harry Pope and Sarah Lacy have both married other persons since their separation.   That said Sarah has three other children by the said Moses, to whom she was married.   That said boy Elkin is in his fourteenth year; that the other children of the said Harry and Sarah are younger, twelve years old.

"Defendant proved substantially that Moses and Sarah Lacy lived with one Harmon Carlton during the year 1866; that, at the end of said year they had $50 or $60 worth of provisions; that Mose is very industrious; that he and the said Sarah live with one William Parks this year; that said Parks gives said Mose $10 per month, feeds him, and furnishes him a house to live in; that this is all the said Mose and Sarah get, the said Sarah being permitted to work for herself, and that they feed and clothe themselves, (except Mose, who is fed as aforesaid;) that Sarah was sick a short time last summer; that the said Mose and Sarah could, with the help of said minors, take care of themselves, if they would; that there would be no danger of said Elkin becoming a tax on the county; that said Sarah had hired out the said Elkin to H. Carlton for $40, for the year 1867, food and clothing furnished, and her other boy to E. Mor-

gan for $30, for the same time, and food and clothing furnished; the girl, Leney, to John T. Murray, for $35, and food, clothing, and medical bill paid.

"It was further proved by defendants, Lacy and wife, that they hired to one H. Carlton for the year 1866, and when they left the premises of plaintiff, they carried their said children, to wit, Elkin and Chuff, with them, and hired them to G. W. Pearson for said year 1866, and delivered them to him; and that on the next day Robert Timmins, son of plaintiff, went to Pearson's house with a double-barrelled gun, and carried said children back to the house of plaintiff, claiming them under a contract; and that at the end of the year 1866 said children went back to their mother, and were again taken away by said Robert Timmins, in the month of January, 1867, under an order from the county court, to wit:

"Ordered by the court, that Mrs. Mary B. Timmins, of Cherokee county, be, and she is hereby, authorized to take charge of and control Elkin Pope and Chuff Pope, freed minors, and them safely keep until the last Monday in January, 1867, at which time she will bring said minors before the county court pertaining to estates.

"It was also proved that Harry Pope had never exercised any control over said children, and that they had always been with their mother, except when away, as above stated. It was also proved that Pearson had the consent of Harry Pope to the hiring above stated. It was further proved, that the men to whom said children were hired by defendants for the year 1867 were responsible, and would pay their debts; and that the said defendants, with the aid of their said children, were capable of making a support by their labor, and there was no danger of the said children becoming a charge on the county. That these are substantially all the facts proved on the trial of said cause."

The court found that Sarah Lacy, the mother, was the natural guardian of her children, revoked the order of

the county court, ordered the children to the care of the mother, and gave a judgment for costs. Mrs. Timmins appealed, and assigned the following errors:

"1. The court erred in the admissibility of testimony as to whether the boy, Elkin, was a fit subject to be apprenticed.

"2. The court erred in not regarding the application of the father, Harry Pope, and his written consent filed for the apprenticeship of his son, Elkin, to appellant, and in not considering said consent conclusive under the law of this state regulating apprentices.

"3. The court erred in his judgment that the mother was the natural guardian in preference to the father, the father having the first right under said law.

"4. The court erred in his judgment and decree in this cause, the same being contrary to law and the evidence."

*M. Priest*, for appellant.—It is respectfully submitted, that to the county court the matter of apprenticing minors is exclusively committed; and in the act on this subject there is no provision made for an appeal to the district court, by *certiorari* or otherwise, and the court erred in entertaining jurisdiction in the premises.

In all civil suits, if parties hold themselves forth, and recognize each other as husband and wife, they are so considered, and are responsible accordingly, regardless of the ceremony, form, or manner of marriage. The relationship thus acknowledged they cannot deny or repudiate. This was all the kind of marriages provided for in reference to slaves, and to the parties to such marriages the titles or appellations of "father" and "mother" properly apply. (2 Kent's Com., 52, 53.)

The letter and spirit of our laws in cases of guardianships, which are very analogous to apprenticeships, give the preference to the father over the mother and all other persons, and provides that the father, first in preference,

shall have the custody of the persons, education, and estates of their minor children. (O. & W. Dig., Art. 951.)

The statute of the last session of the legislature, on the very subject of apprenticing minors, gives a like prefer- ence.

It is respectfully submitted, that this act of the legisla- ture, as is well known, is designed for just such children of just such marriages as presented in this case. It surely was intended to apply not only to white children, but also to black children of former slaves, not one of whom was ever married, according to the laws in reference to white persons.

*Bonner & Bonner* and *John T. Murray,* for appellees.

MOORE, C. J.—It is insisted by appellant, that the judg- ment in this case should be reversed, for want of jurisdic- tion of the district court to bring before it, by *controrari,* the proceedings of the county court apprenticing the minor, Elkin Pope, for its revision and correction. The law under which the action of the county court in this case was had conferred, it is said by appellant, on that court a special and exclusive jurisdiction over the entire subject-matter pro- vided for therein, and that its judgments, or any proceed- ings had under this law, cannot be reviewed or brought in question, either by appeal or *certiorari,* in the district court or any other tribunal. We are referred to no authority to sustain this position. Reliance is had, it is supposed, how- ever, upon the cases of Baker v. Chisholm, 3 Tex., 157, and Arberry v. Beavers, 6 Tex., 457. An examination of these cases makes it quite apparent that they cannot be relied upon to support the position contended for by ap- pellant.

In the first of these cases the court says: "The authority conferred upon the chief justice of the county by this statute was special, and restricted to one express object. No mode

is provided for revising his decision, either by the special statute which conferred the authority, or by any general law.    His exercise of the authority conferred was definite and final." And in the other case it is said: "The authority here conferred was in the nature of a special commission, which was determined by the performance of the act to which it extended.  It did not constitute the officer a judical tribunal," or "inferior jurisdiction," within the meaning of the constitution. (Const., art. IV, sec. 10.) That had reference to those inferior judicial tribunals which are constituted to administer the justice of the county, and whose proceedings are according to the course of the common law.  *  *  *  That it was the chief justice of the county who was empowered to act in this case did not change the character of the authority conferred.  The duties imposed by the act had no connection with his official duties as chief justice, and might as well have been required of any private person."

The statute under which the county court acted in this case provides, " That in all applications for apprenticeship ten days' notice, as in case of guardianship, shall be given, and no minor shall be apprenticed except at a regular term of said court."   But the county court does not derive its jurisdiction in the matter from the statute, for, though it is to be regulated by law, it is conferred upon the court by the constitution of the state as directly and positively as on any other of the several branches of its jurisdiction.   It follows, therefore, that its action in this particular is that of an "inferior tribunal," and in which the district court is given by the constitution (art. IV, sec. 6) a general superintendance and control, with power, when necessary for this purpose, to issue writs of injunction, *certiorari*, &c. (Newson v. Chrisman, 9 Tex., 113, and cases cited.)

The 16th section of the IVth article of the constitution, defining the jurisdiction of the county court, in express terms delegates to it authority to apprentice minors,

under such regulations as may be prescribed by law; and
while the 6th section of the same article, when enume-
rating the different subjects of which the original jurisdic-
tion had been conferred on the county courts, to which the
appellate jurisdiction of the district court should extend,
does not, in direct terms, include or refer to this branch of
the jurisdiction of the county court, yet it would, we think,
require a more technical construction of this section of the
constitution, than there seems any necessity for giving it,
to hold that it restrains the district court from the exercise
of a superintendence and control over the action of the
county court in this particular, under the previous clause
of the section conferring this authority in respect to all
inferior tribunals.   It could only be said, at most, if this
reference to the subjects for which the county court is es-
tablished should be regarded as a limitation of the appel-
late and original jurisdiction of the district court on it,
rather than for description and identification of the county
court, acting in the character and capacity here referred
to, instead of as a court for the transaction of police and
county business, that the district court could not, in respect
to the matter in question, exercise appellate and original
jurisdiction in a matter passed upon in the county court by.
an appeal; yet it could nevertheless exercise a general con-
trol and superintendency over it by *certiorari,* or any other
writ appropriate for this purpose, and in conformity with
the established usage of the common law or statutory
enactment.

That the district court, by virtue of the authority con-
ferred on it by this section of the constitution, may exer-
cise control over inferior tribunals, is fully sustained by
decisions in analogous cases entitled to our highest con-
sideration.

"The superintending control," says the supreme court of
Arkansas, (*ex parte* Anthony, 5 Pike, 365,) "given by the
constitution to the supreme court, and all inferior and other

courts of law and equity, is in no respect different from that possessed by the circuit courts, except in this, that the latter is limited to the county courts and justices of the peace, while the former is extended to all courts in the state. The language in both instances imports the same thing, and the power derived from it must be exercised in like manner by each tribunal; consequently no appellate jurisdiction is granted to either. Yet the power vested by the constitution in the supreme court, to issue writs of error, *supersedeas, certiorari,* and *habeas corpus, mandamus,* and *quo warranto,* and other remedial writs, and to hear and determine the same, does, in our opinion, confer upon this court, by express grant, the power of adjudicating all cases determined by an inferior judicial tribunal in the state, when, according to the principles of the common law, the case so determined can by means of any of the writs aforesaid be legally and appropriately brought before it, and to this extent the constitution gives to this court an appellate jurisdiction of which it cannot be deprived by an act of the legislature. But the legislature is fully competent to prescribe by law the order of proceeding to be observed in the exercise of this power, provided the proceeding so prescribed does not in any manner abridge or affect the jurisdiction of this court." (Bob, a Slave v. The State, 2 Yerg., 173; Hays v. Pope County, 5 Pike, 308; *ex parte* Tarlten, 2 Ala., 35.)

It is also equally clear, that the writ of *certiorari* is an appropriate remedy in such cases as the present. "In England," says the supreme court of Ohio, (Walpole v. Ink, 3 Ohio, 143,) "the remedy by *certiorari* is twofold, to remove the case for trial into the court above, or merely to inquire into the correctness of its orders."

And in Ruhlman v. The Commonwealth, 5 Binney, 24, it is said: "The distinction is thus taken in Grenalt v. Burwell, 1 Salk., 263; S. C. Carth., 494; Com. R., 80; 1 Lord Ray, 469. Whenever a new jurisdiction is erected

by act of parliament, and the court or judge that exercises this jurisdiction acts as a court or judge of record, according to the course of the common law a writ of error lies on their judgment; but when they act in a summary method, or in a new course different from the common law, a writ of error does not lie, but *certiorari.*" (Broks v. Morgan, 5 Ired., 485; Weldz v. Washburn, 16 Johns., 49; Savage v. Gulliver, 4 Mass., 177.)

In Tennessee, where the circuit court has authority to issue the writ of *certiorari* merely by virtue of its authority to supervise and control inferior tribunals, in a case where the reputed father of an illegitimate child whom he had legitimated in the county court in the manner prescribed by the statute of that state, it was held that the county court had no power to put such child in the custody of the father, or to bind it contrary to the wishes of the mother, unless the child is a pauper. "The county," says Catron, J., "were mistaken in supposing that the reputed father had any right to the possession of the child. Therefore the order of the court, authorizing him to take possession thereof, must be quashed. And so the circuit court ought to have ordered, had the cause been brought up by *certiorari.*"

It remains for us to inquire as to the correctness of the decision of the court below on the merits of the case presented by the *certiorari.*

This proceeding commenced in the county court by the application of appellant, under the 1st section of the 43d chapter of the acts of the last session of the legislature, to have apprenticed to her the minor, Elkin Pope, alleged in the amended application to be under fourteen years of age. The minor is alleged to be the offspring of the appellee, Sarah Lacy and Harry Pope, born while they were held in slavery, and while they cohabited as man and wife, having married, as is said, "after the usual fashion of marriages with slaves." The minor, it seems, has been at all

times recognized by Harry Pope as his child, but the connection between him and the appellee, Sarah, had ceased some ten years before they were emancipated, and both of them had contracted other marriages, also after the custom of marriages with slaves; and have never since their separation recognized each other as husband and wife. The minor, Elkin, was with his mother when they were emancipated, and continued with her or under her control until he was taken by force to the residence of appellant by her son, with the consent of said Harry. But, as soon as he seems to have been permited to do so, he returned to his mother, and remained with her or under her control until the commencement of this proceeding.

The order of the court apprenticing the minor to the appellant seems to be approved by his reputed father, Harry Pope, and the only question which it is necessary for us to determine at the present time is, whether this is sufficient to authorize the court to apprentice him, notwithstanding the opposition of his mother, and her ability to support and maintain him. We are clearly of opinion that it is not. It is a universally recognized principle of the common law, that the father of a bastard has no parental power or authority over such illegitimate offspring. It is difficult to conceive upon what ground it can be imagined that the reputed father of the minor in question can be held entitled to exercise the rights of a parent over him. The fundamental definition of the word bastard is, a child born out of lawful wedlock. And there can surely be no lawful wedlock between parties who are under disability, and cannot exercise the freedom of consent essential in any contract. (State v. Samuel, 2 Dev. & Batt., 177; Hall v. Mullin, 5 Har. & John., 193; Jackson v. Leroy, 5 Cow., 397.) In the first of these cases, it is held that the marriage of slaves, consisting of cohabitation merely by the permission of their owners, does not constitute the relation of husband and wife, so as to attach to them the privileges and disabilities incident to the

common law; and hence that a slave who was the wife of another slave might give evidence against him even in a capital case.

And in Jackson v. Leroy, it is said: "By the civil law slaves could not take by purchase or descent. They had no heirs, and therefore could make no will. They were not entitled to the rights and considerations of matrimony, and therefore had no relief in case of adultery. Nor were they proper objects of cognation or affinity, but of *quasi* cognation only. (Taylor's Elements Civil Law, 429; Cooper's Justinian, 411, 420.) Contubernism was the matrimony of slaves; a permitted cohabitation, not partaking of lawful marriage, which they could not contract. The same disability, I apprehend, will apply to the case of slaves with us. The state of slavery in this country compares with that existing under the Roman law in many respects. The progress of society in civilization, more correct notions on the subject of moral obligation, and, above all, the benign influence of the Christian religion, have softened many of the rigors attendant on slavery among the ancients. But the rights of the slave, in respect to marriage and the acquisition of property by way of inheritance, remain substantially on the same ground." (Cunningham v. Cunningham, 1 Harris & McHenry, 561; Bynum v. Bostick, 4 DeS., 266; Marbletown v. Kingston, 20 Johns., 1; 20 How., St. Tr., 27.) These authorities show very conclusively that the permitted cohabitation existing formerly among our slave population did not partake of lawful marriage. If we could say the legal rights of husband and wife, parent and child, spring from these connections, it must also be held that corresponding disabilities flow from them, many of which are of a severely penal character, affecting almost this entire portion of our population.

Whether the mutual and continued voluntary recognition since emancipation of a subsisting marriage, between the parties to such pre-existing permissive cohabitation during

slavery, does not give ·to such connection the sanction of legal marriage, presents a very different question.

It is said with much force by MATTHEWS, J., in delivering the opinion of the court in the case of Girod v. Lewis, (6 Mart., 559,) "It is clear that slaves have no legal capacity to assent to any contract. With the consent of their masters they may marry, and their moral power to agree to such a contract or connection as that of marriage cannot be doubted; but whilst in a state of slavery it cannot produce any civil effect, because slaves are deprived of all civil rights. Emancipation gives to the slave his civil rights; and a contract of marriage, legal and valid by the consent of the master and moral assent of the·slave, from the moment of freedom, although dormant during slavery, produces all the effects which result from such contract among free persons."

This opinion certainly places the law on this subject in as favorable a light for appellant as can possibly be insisted upon. But it evidently falls far short of supporting the judgment of the county court in this case. For most certainly emancipation can have this effect only in such connections as are existing between slaves at the time it takes place. Indeed, the only ground upon which the decision can be maintained is, that the assent manifested by their continued cohabitation, after acquiring capacity to contract, gives validity to the existing relation, sanctioned by moral, though not by legal obligation.

If, however, the father of this minor was his legitimate parent, I think it would be an erroneous and unreasonable construction of the statute to suppose that this child could be taken from its mother against her consent, and apprenticed solely at' his will and pleasure. It was evidently, to my mind, the object and purpose of the law to give this authority to the parents or guardians of minor children subject to their control, and for whose care and nurture they were providing. Surely it is not to be supposed that

merely because the father, when discharging his duties as such, is regarded as the head of the family, may, after years of desertion and abandonment, during which he has left his wife to struggle unaided for their support, rob her, by means of this law, of the society of her children, and thus add to the injury already done her the severest blow which can be inflicted upon a woman, whatever may be her condition or sphere in life.

Although it was insisted for appellant that the county court had exclusive and final jurisdiction in respect to the apprenticing of minors, yet as no objection was made to the manner of proceeding in the court below, and the trial of the matter in that court *de novo*, and especially as the judgment of the court is correct upon either hypothesis, we have not deemed it necessary to inquire at this time whether the writ of *certiorari* authorized by the constitution, especially in absence of any statute regulating it, is limited merely to the bringing of the record and proceedings of the inferior court to the district, for the correction of such errors of law as may have been committed in the proceedings had in such court, or whether, under it, the whole matter may be brought before the district court for a trial *de novo*.

There being no error in the judgment of which appellant can complain, it is

AFFIRMED.