Mb. Justice Westcott
'delivered the opinion of the court.
The Judge of the Circuit Court instructed the jury that a marriage to be valid in this State must he solemnized by a Minister of the Gospel, or a Judge of a Circuit Court, or a Justice of the Peace, or a Notary Public, except in the case of persons of color, coming within the act of December 14, 1866, entitled “an act legalizing the marriage of persons of color” who were living together as husband and wife at the time of the passage of that act. “ The children of parents who were not legally husband and wife cannot inherit.” This instruction is here alleged for error. There being certainly no statute in this State anterior- to the statute approved January 11, 1866, based upon the idea that no marriages shall he valid unless they are solemnized by the officers mentioned in the statute prescribing the manner of entering into the contract, it follows that the above instruction was erroneous, even admitting the con- • stitutionality of that act. Being erroneous, it certainly withdrew from the consideration of the jury all evidence, if any there was, of informal marriage by contract, “per verla de preeenii,” anterior to January 11, 1866. The opinion of the Supreme Court of the United States, in the case of Meister vs. Moore, 96 U. S., 79, expresses our view of this question, and we repeat here the language of that court, as it is entirely applicable to the question as it arises, and we have stated it in this case under our statutes. That court says, “that such a contract constitutes a marriage at common law there can be no doubt, in view of the adjudications made in this country, from its earliest settlement to the pres.ent day. Marriage is everywhere regarded as a civil contract. Statutes in many of the States, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence they are not within the principle that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive, * * * A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of bans, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common law right to form the marriage relation by words of present assent, and such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity.
It may be that there is no evidence of a common law marriage in this record, but it is contended that there is a recognition .by the parties of the existence of the antecedent marital relation between them since emancipation of the mother and before any legal impediment to such recognition existed, and it is eminently proper, whatever may be our opinion of the facts, that the question should be submitted to a jury under instructions not erroneous in their character, and of such nature as to enable the jury to give to the facts such weight as the rules of evidence authorize and require. Where the instructions are erroneous, it is a delicate matter for this court to give judgment according t'o the weight of evidence.
Involved in this case is the construction of the several statutes relating to the subject of marriage in this State as well as the determination of the effect of a cohabiting by persons as husband and wife on the part of a freeman of color and a slave woman, as well as the effect of a cohabitation before emancipation, coupled with confirmation by c¿habitation or otherwise after emancipation.
While the American courts admit that there is a moral obligation, which natural law imposes, in the relation ot husband and wife among slaves, still, as remarked by a learned judge, its legal consequences must flow from the municipal law. This does not recognize the’marriages of slaves. 9 Ala., 990; 6 Jones, N. C., 235; 6 Binn., 206, 211; 24 Ala., 719; 2 Dev. & Bat., 117; 30 Tex., 115; 45 Mo., 595; 1 Bush, 62.
Under the then recognized municipal law no property could vest in their issue upon their death. As to these children, however, the status of bastardy, as remarked by Mr. Bishop, (1 Bishop on M. and D., 163,) was as foreign to this institution ' (slavery) as the status of legitimacy. They had no foul or corrupt blood. The simple fact was that they had no status as to this particular, one way or the other. ,
Was there any law in force in this State, statutory or otherwise, which gave to this class inheritable blood? We do not think there was, because the condition of legitimacy as stated did not attach to them, and it was necessary that they should not only not be bastards, but that they should be legitimate under the municipal law to inherit under our statutes and the law controlling the subject. We do not doubt, however, that a marriage after emancipation, or a subsequent cohabitation as husband and wife, or any other plainly established assent by both parties to the continued *130 existence of a marital relation, entered into before emancipation according to the usual form of slave marriages, would operate to render legitimate their children. This assent must be by both parties. Such acts make children of a former slave marriage legitimate. This result, we think, follows from an equitable construction of the statute of this State, rendering children born out of wedlock legitimate, under which a child thus begotten is deemed and held legitimate by. a subsequent marriage of the parties as well as by the rules of law announced by the courts of the several States in the disposition of questions concerning slave marriages. 5 Cold., 18; 65 N. C., 537; 45 Mo., 595. Such acts after emancipation ratify their invalid marriage and render their antecedent issue legitimate., A similar principle to this prevails in reference to marriages of persons non compás,, to infants, and to marriages induced by fraud or duress. In these- cases, the antecedent illegal marriage, by consummation in a lucid interval, or by subsequent consent in case of duress, renders the marriage good.*
This brings us to the consideration of the several statutes which in argument are brought to our attention and which it is insisted control this case.
The first statute is the “act in relation to escheats.” The statute provides, “that whenever, upon- the death of any “person of color, seized or possessed of real or personal estate, there are persons in being who would -inherit said “property1 or any portion thereof, under the .several statutes “of descent of this State, but who are prevented from so “doing on account of the legal incapacity of said persons of “color to contract marriage in a state of slavery, which “said estate would otherwise escheat to the State, all the “right, title, and interest of the State of Florida is hereby “vested in and waived in favor of those persons who would “have inherited said estate, if said parties had been competent to contract marriage.
“That the fact that said parties shall have failed to obtain a license to marry, or shall have failed to be married “according to the forms of law, shall in no case affect the “operation of this act, but the same shall be held to apply “to all cases wherein the parties were known as husband “and wife.”
This statute is based upon the law as we have announced it, viz: that the issue of slaves did not have inheritable blood.
The effect of this statue is not to impair any marriage, whether it be a slave marriage made good by acts after emancipation or a marriage of enfranchised persons. The statute is based upon the principle that slaves were not competent to contract a marriage, the issue of which would have inheritable blood, and it provides that where the operation of this rule prevents their children, born in slavery, or any other person, from inheriting their estate, and for want of heirs at law their properly would go to the State, there the right of the State is vested in such persons then in being, who are prevented by this rule of law from inheriting the property.. The view, therefore, that this act contemplates,, any validity in a slave marriage independent of ratification' after emancipation, or that it renders, or attempts to render, the issue of a slave marriage legiimate, is entirely erroneous. There can be no doubt about the construction of this statute. Its language is plain and unequivocal.
It is insisted that this case comes within the provisions of chapter 1552, Laws, being an act entitled an act legalizing the marriage of persons of color, approved December 14, 1866. That act provides, “that in all cases where colored persons have resided and lived together as husband “and wife, and have before the world recognized each “other as husband and wife, they shall be deemed and “taken to be husband and wife, and are so declared to be “by this act as fully and lawfully as if the marriage had “been solemnized by a proper officer legally authorized to “do and perform the same; and all children born of such “parents are hereby legitimized and made heirs of such “parents, and capable of inheriting under the laws of this “State, as though he, she, or they had been born in lawful “wedlock; that all indictments now ponding in any of the “courts of this State against persons of color for fornication “and adultery, when they have been living together in the “said relation, shall be abated and dismissed.”
This act, and the act in reference to escheats, as well as chapter 1469, being an act to establish and enforce the marriage relation between persons of color, approved January 11, 1866, being acts in reference to the same subject matter, must be construed together. The last-named act provided in substance that it shall be required of all colored inhabi-tan ‘3 of this State, claiming to be living together in the relation of husband and wife, and who have notcbeen joined as such agreeably to the laws regulating the same, and who shall mutually desire to continue in that relation, within nine months from the passage of this ,act to appear before some person legally authorized to perform the marriage ceremony, and be regularly joined in the holy bonds of matrimony, and if any such person, either male or female, after the expiration of the time limited in this act, shall be found cohabiting as husband and wife, and who have not,been so joined together, they and each of them shall be deemed to lie guilty of a misdemeanor, and upon conviction, shall be subjected to the pains and .penalties prescribed for fornication and adultery. The act provides further, that the issue of the prior cohabitation shall be made legitimate by the act of marriage; that the marriage certificate shall be recorded, and that persons illegally assuming to perform the marriage ceremony shall be guilty of a misdemeanor. The last section provides that from and after nine months after the pasasge of the act, all laws applicable to or regulating the marriage relation between white persons shall apply to the same relation between the colored population of the State.
A casual examination of these two statutes will show that there is nothing in them in conflict with the act in. reference to escheats, which is based upon the idea that the issue of slaves do not possess inheritable blood.
The first act, January 11, 1866, is based upon the erroneous idea that the statute regulating the performance of the rite of marriage, rendered illegal marriages npt celebrated according to its .provisions, and contemplates that, notwithstanding a previous living together as husband and wife, whether such living was during slavery or since its abolition, a marriage according to the statute -was necessary to legalize the issue springing from such cohabitation and recognition of each other as husband and wife, and nine months was fixed as a period in which, by a marriage according to the statute, the issue of the “prior cohabitation” might be entitled to the privileges of legitimate offspring.
This statute, according to its terms, subjected to prosceution persons who had'fin good faith consented to the marriage relation at common law, and an evil which originated from it was' the punishment as criminals of persons who, without any actual intent of committing wrong, had assumed and consented to the marriage relation in good*faith. Such a statute enforced would have filled the jails of the country with persons subject to the charge of fornicátion and adultery from an innocent cohabitation as husband and wife. Obviously this was considered an evil, for within three months after this provision went into operation, the act of December 14, 1866, before recited, was passed, by which all in *131 dictments then pending under the act of January 11, 1866, were directed to be abated.
Construing these three acts together, relating as they do strictly to-the same subject, the rharital relations of persons of color, it is evident that the act of December 14, 1866, must, in .order to be consistent with the act of December 12, 1866, and of January 11, 1866, be construed to refer to a cohabitation'■ and “recognition” occurring since the emancipation of the slave, because the act of January 11, 1866, is founded upon the idea that cohabitation in the relation of husband and wife did not bestow any marital rights at any time, and the act of December 12, 1866, is based upon the “legal incapacity of persons to contract marriage in a state of slavery.” A consistent and harmonious operation of the acts of December 14, 1866, and December 12, 1866, restricts the operation of the act of December 14, 1866, to a living together as husband and wife since emancipation. The language of the act is broad enough to cover a slave marriage, but to give it that construction would bring it in conflict with the express language and operation of the act of December 12, 1866.
It is unnecessary in this case to determine whether the living together contemplated by that act must have been cotemporary with its passage as well as preceding it, as in this case .there is not even a pretense of a cohabitation by the parents of appellants at my time since the-emancipation of their mother, and we have no doubt at all that the Legislature in this act did not refer to a cohabitation as husband and wife incident to a customary slave marriage.
The views expressed cover the errors assigned in every aspect of the testimony, and indicate the extent to which in several respects there was error in the charge of the court.
The judgment is reversed, and the case will be remanded with directions to award a new trial.